J-A14001-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF M.G.R. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 32 WDA 2021 |

Appeal from the Order Entered December 1, 2020
In the Court of Common Pleas of Blair County
Orphans' Court at No:  2019 AD 27

BEFORE:  MURRAY, J., KING, J., and MUSMANNO, J.

MEMORANDUM BY MURRAY, J.:                **FILED: AUGUST 18, 2021**

A.W. (Mother) appeals from the order involuntarily terminating her parental rights to her daughter, M.G.R. (Child), born in August of 2010.  Upon review, we affirm.

On May 24, 2019, A.J.C. (Father), and his wife, A.M.C. (Stepmother), petitioned for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b).  Father and Stepmother averred that Child had resided with them since June 2012, and Stepmother wished to adopt Child.

The court held a hearing on January 7, 2020, which continued to a second day on January 9, 2020.  Larry Lashinsky, Esquire, served as Guardian Ad Litem (GAL), and represented the legal and best interests of Child, who was then nine years old.  The parties testified, and Mother presented the testimony of T.M. (Maternal Grandmother); Z.W., Mother's son, who was in

ninth grade; A.R., Mother's ten-year-old daughter; and J.M., Mother's paramour. Child testified *in camera* with Attorney Lashinsky present.

Father testified that he was diagnosed with stage IV lung cancer in 2017; in 2019, he learned the cancer had metastasized to his brain. N.T., 1/7/20, at 52. The cancer also metastasized to his lower spine. *Id.* at 38. Father explained that his diagnosis motivated Stepmother to pursue legal adoption of Child because "we were concerned about what would happen with [Child] if things turn to the worst for me. [Mother] has never been there for [Child]." *Id.* at 43.

### Family History

In February 2012, Child and her three half-siblings were removed from Mother's care by Blair County Children, Youth and Families (CYF). Orphans' Court Opinion, 12/1/20, at 6 (citing N.T., 1/7/21, at 127). CYF placed Child with her maternal aunt. *Id.* at 7. The orphans' court observed "the initial 90-day effort by Children and Youth to restore [Mother's] children fail[ed]. In fact, it was extended for another ninety days." *Id.* at 17. According to Mother, CYF was involved for "like 6 or 7 months." *Id.* at 17 (citing N.T. 1/7/20, at 128-29). There is no evidence Child was adjudicated dependent, although the orphans' court noted that Mother "never explain[ed] why the ninety-day plan went on for six months. She never explain[ed] why she failed to get her children back." *Id.* at 18.

In Mother's words, Child was placed "with Mother's sister but was soon after placed with Father." Mother's Brief at 6. Mother states that when Child "was placed in the custody of Father, the child dependency case ended and the parties were advised to pursue custody and visitation arrangements[.]" *Id.* Father likewise states, "Child was placed with Mother's sister, but very soon after Child was placed with Father." Father's Brief at 3.

During this time period, on March 26, 2012, Father filed a *pro se* custody complaint. The custody docket was admitted into evidence as Petitioners' Exhibit 3. The orphans' court observed:

> To this point, Mother's "involvement" in these custody proceedings consisted of two contempt petitions which were filed against her on June 27, 2012 and again on August 23, 2012, alleging first her failure to appear and then her failure to complete the Children's First Program.

Orphans' Court Opinion, 12/1/20, at 8.

Father describes the custody proceedings as taking "a while because Mother failed to show up for court conferences," including two pre-trial mediation conferences and a pre-trial conference before a hearing officer. Father's Brief at 4. The custody docket reflects that on August 21, 2012, an order was entered "directing that the parties shall share the physical and legal custody of their child/children and child/children shall reside w/Father." Petitioners' Exhibit 3.

On October 15, 2012, Maternal Grandmother filed a petition to intervene, which was granted the following month. *Id.* By consent order

entered in February 2013, Father had primary physical custody of Child, with Maternal Grandmother having partial physical custody on alternating weekends in Maternal Grandmother's home.[1] *Id.* at 9. The orphans' court stated that "the biweekly visits between the maternal grandmother and [Child] constitute[d] the only contact [M]other has had with [Child since 2012]." *Id.*

At the time of the 2020 termination proceedings, a subsequent but similar order, dated February 13, 2015, was in effect; the order awarded Father and Mother shared legal and physical custody, and directed that Child continue to live with Father. Petitioners' Exhibit 1 at ¶¶1-2. The order specifically awarded Mother "visits with [C]hild . . . during Maternal Grandmother's periods of custody," which continued on alternating weekends. *Id.* at ¶¶3(A)-(B). Maternal Grandmother testified that Mother visited Child when Child was in Maternal Grandmother's custody. N.T., 1/7/20, at 66.

With respect to how often Child saw Mother, Child testified *in camera*: "Not a lot of the time. She'll be running with my gram but that's like every other weekend I go with her." N.T., 1/9/20, at 2-3. Child responded to questioning by her attorney, Mr. Lashinsky, as follows:

---

[1] Although the custody docket was introduced into evidence, some of the individual orders were not, and in those instances, we recite the wording of orders as stated in the docket. It appears from our review of the record as a whole that Mother agreed to the consent orders and was granted supervised visitation with Child while Child was in Maternal Grandmother's custody.

Q. So now you see your grandma like two weekends out of the month basically, and how many of those occasions would you see your mom?

A. Like probably like the first weekend I don't see her and then the next weekend I see her for maybe like two hours.

Q. Is that because of work or don't you know why?

A. I don't know why.

. . .

Q. And what do you do when your mom is around?

. . .

Q. Does she spend special time with you is what I'm asking?

A. No. She's usually in the living room or outside.

*Id.* at 5. Child added, "Well sometimes like once in a while we'll play like a board game." *Id.* at 6-7.

On September 10, 2020,[2] counsel presented closing arguments.[3] By order entered December 1, 2020, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b). The court issued an accompanying opinion concluding its "examination of this eight-year history from 2012 until 2019 [*sic*] will allow for no other conclusion other than [M]other has failed repeatedly over this entire timeframe to perform her

---

[2] The orphans' court explained the case was delayed "due to the closing of the courthouse during the pandemic." Orphans' Court Opinion, 12/1/20, at 2.

[3] The GAL, Attorney Lashinsky, advocated for termination at oral argument, and repeats this advocacy in his appellate brief.

parental duties without adequate explanation, excuse, or effort." Orphans' Court Opinion, 12/1/20, at 6.

## Legal Analysis

Mother timely filed a notice of appeal and a concise statement of errors complained of an appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On appeal, Mother presents the following two questions:

I.   Whether the [orphans'] court erred and/or abused its discretion when it found clear and convincing evidence existed to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2)[?]

II.   Whether the [orphans'] court erred and/or abused its discretion when it found clear and convincing evidence existed to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(b)[?]

Mother's Brief at 4.

We review the termination order for an abuse of discretion. Our Supreme Court has explained:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, the certified record supports termination pursuant to Section 2511(a)(1) and (b), which provide:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein

> which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).[4]

Under Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citation omitted). "Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties." *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 91 (Pa. 1998) (underline emphasis in original) (citation omitted). In addition,

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re N.M.B.*, 856 A.2d 847, 854-55 (Pa. Super. 2004) (citations omitted).

---

[4] Because the orphans' court did not terminate Mother's parental rights under Section 2511(a)(2), we do not consider Mother's arguments regarding that subsection.

Regarding the definition of "parental duties," we have stated:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

The court must consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before conducting a Section 2511(b) analysis. *In re Z.S.W.*, 946 A.2d at 730 (quoting *In re Adoption of Charles E.D.M.*, 708 A.2d at 92). With respect to Section 2511(b), "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re*

*C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted).  The court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted).  "The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008) (citation omitted).

In her first issue, Mother argues the evidence does not support termination under Section 2511(a)(1) because she consistently visited Child and performed parental duties during the visits.  Mother also references petitions she filed in 2014 and 2019 seeking to modify custody.  Mother states she missed the scheduled conciliation conference in 2014 because she was "hospitalized for mental health."  Mother's Brief at 11 (citing N.T., 1/7/20, at 136-37).  Mother further asserts that from 2014 through 2019, she did not seek additional custody because she,

> was afraid that Father would use her hospitalization in 2014 against her.  [N.T.,] 1/7/20, [at] 138.  She testified that she was afraid of Father and what he might do if she pursued custody. *Id.* at 133-134, 135, 149, 174, 181-182, 183.  She was at least able to have contact with [Child] through Maternal Grandmother's visitations so was content. *Id.* at 138.  That contentment ended in 2019 when she attempted to pursue modification.

Mother's Brief at 12.  The record does not support Mother's argument.

The orphans' court determined that from early 2012, until Father and Stepmother filed for termination in 2019, Mother was "only involved with [Child] through the efforts of the maternal grandmother.  All of her contact

with [Child] over those eight years (2012-2019) will be at the maternal grandmother's home. She will <u>never</u> have [Child] alone in her sole custody." Orphans' Court Opinion, 12/1/20, at 7 (underline emphasis in original).

The court described Maternal Grandmother's custody on alternating weekends as "not simply visits with the maternal grandmother and [Child]." *Id.* at 9. The court explained:

> They are much more. In fact, entirely through the efforts of the maternal grandmother, she has created a situation where six of her grandchildren (including [Child] and [M]other's other three children) are with her during these biweekly weekend visits. As a result, she has created what amounts to a biweekly family reunion not only for [M]other's four children but two other grandchildren as well.

*Id.* at 9-10. The court continued:

> This puts [M]other's contact over the years with [Child] in context. She sees [Child] (only) when she is present at these reunions together with all her other children and their cousins. Of course, the resulting reality is [M]other's interaction and performance of parental duties with any individual child is limited by definition. Clearly, this is not a situation in terms of these reunions where [M]other has any real "custody" of [Child] or the "alone" time necessary to develop a deep mother/daughter relationship. Everything is in a group setting. Simply put, the maternal grandmother is in charge, and [M]other, to the extent she has contact with [Child], is always under her supervision.

*Id.* at 10.

The court's assessment is supported by the record. For example, when asked whether Mother cares for Child during Maternal Grandmother's custody, Maternal Grandmother answered:

> [Mother] has done crafts with [Child]. She has played outside with [Child]. We have gone places with them. It is all of her

- 11 -

children. I get all of the grandkids. I have seven grandkids but I get all six of them, the older ones, every other weekend so that they can all be together and see each other, and [Mother] helps me with that. She helps me with getting meals ready and, you know, bedtime snacks, and we do a lot of things with them.

N.T., 1/7/20, at 65-66. This testimony supports the court's conclusion that

Mother "is cast in the role of almost an assistant babysitter." Orphans' Court

Opinion, 12/1/20, at 11.

In considering Mother's testimony, the court found:

[M]other does not come before the [c]ourt to talk about her actual performance of parental duties. On the contrary, . . . she comes before the [c]ourt to assign blame to others for her failure to perform. In that regard, [CYF], the court system, [F]ather, and the proposed adoptive mother are depicted as failing her.

*Id.* at 13-14 (citing N.T., 1/7/20, at 144-47). The court explained:

[T]he only other testimony by [M]other involving anything that might be considered a parental duty came out as a spontaneous response to a different question by her counsel having nothing to do with parental duties. As part of the answer, she offered the following:

I give [Child] money for the clothes that she wears at mom's house. I pay for her toys. I give her a birthday party every year. That's my money, which I have the photographic evidence of that.

[N.T., 1/7/20, at] 154.

Beyond this lone response, there is no evidence in this case to support the conclusion [M]other actually performs any parental duties with [Child]. Further, these claims are not supported by the testimony of the maternal grandmother.

Orphans' Court Opinion, 12/1/20, at 14. The court accurately states that

Maternal Grandmother, in her testimony, made "absolutely no reference to

[M]other making even a single financial contribution or giving a major gift to [Child] during the grandmother's weekends over the past eight years." ***Id.*** Accordingly, the court concluded Mother "failed to perform any significant parental duties over the last eight years." ***Id.*** at 15 (underline emphasis in original). The court further observed Mother "repeatedly references her 'fighting' to obtain custody," but found "she did nothing of the sort." ***Id.*** at 18. The orphans' court did not abuse its discretion.

The custody docket shows Mother first filed for custody in August 2013. Following mediation, Mother — for the first and only time — requested an evidentiary hearing. However, Mother's request was procedurally premature as it was made during the pendency of the mediation order, and consequently, the hearing did not occur. The orphans' court observed that "[n]o timely request was made after service of that order by anyone." Orphans' Court Order, 12/1/20, at 21. More than a year later, on December 3, 2014, Mother filed another modification petition. Following a conciliation conference, the court issued the February 2015 consent order. On July 16, 2015, Mother filed another petition for modification, which was dismissed because Mother did not pay the filing fee. Again, on April 4, 2019, Mother filed a petition for modification. Father testified that filing was prompted after Mother messaged him on Facebook in February 2019, asking for Child to "live with her 50 percent of the time." N.T., 1/7/20, at 33. Father advised her that Stepmother wanted to adopt Child. ***Id.*** at 39. He also expressed concern about Mother

- 13 -

communicating through Facebook, stating, "I've never had a way of getting a hold of her. I've never known how to get a hold of her, nothing. I've never known where she has lived. . . ." *Id.* at 35.

The orphans' court afforded little weight to Mother's custody filings. The court explained:

> When she was asked to comment on why she did nothing further for four years from 2015 until 2019 by her counsel, [Mother] answered as follows:
>
> A. Yes, and that's because [Father] was taking everybody to court and taking their rights from them and I was scared he was going to try to pull something like that on me and because I hadn't been able to see my daughter for two years, nobody cared about that and for all the other custody things and nothing was happening in my favor when I should've been the one that would have been favored. I was frustrated. I felt scared and I was not going to lose my child. So I'm going to do my visits the way that the [c]ourt ordered me to do them.
>
> (*See* [N.T., 1/7/20, at] 174).
>
> This testimony is so far over the edge it is sad. Taking it sentence by sentence, [F]ather has filed absolutely nothing with this court regarding anyone's custody since June 21, 2012. As to taking away anyone's rights, after their agreement in 2012, the maternal grandmother in her testimony makes not even <u>one</u> complaint that [F]ather interfered or failed to provide her with the biweekly visit to which they had agreed. . . .

Orphans' Court Opinion, 12/1/20, at 22-23 (underline emphasis in original).

The court added, "**In fact, no one was preventing [M]other from seeing [Child] other than her own lack of effort.** She never gave the court system or [CYF] a chance, preferring her own world of occasional interest, no follow-up, blame of others, and self-pity." *Id.* at 23 (emphasis added).

Recently, the Pennsylvania Supreme Court stated that "a noncustodial parent's legal attempts to enforce custodial rights will usually be highly relevant evidence" when "undertaken in earnest to establish meaningful contact with a child who is otherwise withheld from access by the custodial parent." *In re Adoption of C.M.*, 1 MAP 2021 at *54, 2021 WL 3073624 (Pa. July 21, 2021). Instantly, and to the contrary in this case, the orphans' court found Mother's attempts were not "in earnest," and Father did not withhold access to Child. The record supports the court's determination that Mother's "limited contact . . . with [Child] was entirely through the efforts of the maternal grandmother. . . . Mother certainly was not making any concerted effort to really parent. Mother simply settled for the status quo under which she assumed no responsibility." *Id.* at 24. As the record supports the court's findings, we discern no abuse of discretion in the court's determination as to Section 2511(a)(1).

With respect to Section 2511(b), Mother asserts she and Child "are very close and enjoy each other's company." Mother's Brief at 15. Further, Mother claims Father "has discouraged [Child] to call [*sic*] Mother 'mom' while in his presence but when out of Father's presence, [Child] calls Mother 'mom.'" *Id.* at 16 (citing N.T., 1/7/20, at 68-69, 162, 206). Mother references Maternal Grandmother's testimony that Child "is not happy until she gets to be with [Mother]," and Child calls Mother "Mommy." *See* N.T., 1/7/20, at 68. Mother cites Maternal Grandmother's testimony that in Father's presence, Child is

fearful and does not call her "mom." **Id.** at 68-69. In addition, Mother refers to her testimony and that of her paramour, J.M., that [Child] calls her "Mommy" and/or "Mom." **Id.** at 162, 206.

Pertinently, and conversely, Child testified in response to the GAL's questions *in camera* as follows:

Q. What do you call [Mother]?

A. I call her [by her first name].

Q. [D]oes [Mother] ever suggest that you call her mom or no?

A. She does.

Q. And you don't feel comfortable doing that?

A. No.

N.T., 1/9/20, at 5-6. Moreover, Child testified that she considers Stepmother to be her mom. **Id.** at 6. As to her bond with Mother, the GAL asked and Child responded:

Q. Do you care whether you see [Mother]?

A. No.

Q. Would it upset you if you never saw her?

A. No.

. . .

Q. If you never saw [Mother] again would that upset you?

A. No.

. . .

Q. The people that provide you with the main care and love and support is [in] you[r] view your dad and your stepmom and that's where you would like to be most of the time?

A. Yeah.

*Id.* at 6, 9.

The law is well-settled that it is the orphans' court's role as factfinder to assess and weigh witness credibility. **See In re K.Z.S.**, 946 A.2d at 757. With regard to its consideration of Child's needs and welfare under Section 2511(b), the court, after finding "the evidence overwhelmingly supports a termination of [Mother's] parental rights for failure to perform parental duties," continued:

> That determination leads us to consider whether the adoption is in [Child]'s best interest going forward. The answer is clearly yes. As the testimony establishes, [Stepmother] has been, in all but name, [Child]'s mother since [Child] was two. At the time of this writing, [Child] is ten years old. More than half of her minority has passed.
>
> Based on our interview with her, it is also clear she wants this adoption. It is just as clear she should have it. Regrettably, however, there is still a further consideration in this case. The testimony establishes that [F]ather may very well be terminally ill. If that is, in fact, the case (as it appears to be), the need for [Stepmother]'s long-term relationship to "be there" to protect [Child] as opposed to vesting custody in [M]other, whose home [Child] has never even visited and with whom she has never had an overnight is beyond obvious. . . .

Orphans' Court Opinion, 12/1/20, at 26-27.

Our review of the record reveals ample support for the orphans' court's conclusions. Accordingly, we affirm the order involuntarily terminating Mother's parental rights pursuant to Section 2511(a)(1) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/18/2021